**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**BRANDON MENG**                                                                        **PLAINTIFF**

**VS.**                                                **CIVIL ACTION NO. 2:24-cv-199-KS-MTP**

**WILLIAM CAREY UNIVERSITY,**
**acting through its Division of the College of**
**Osteopathic Medicine,**
**ITALO R. SUBBARAO, D.O., and**
**EDWARD FRIEDLANDER, M.D.**                                              **DEFENDANTS**

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS DEAN SUBBARAO AND WCU'S
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P.
12(B)(6)**</u>

Defendants Italo R. Subbarao, D.O. ("Dean Subbarao") and William Carey University
("WCU") (collectively, "Defendants") submit this Memorandum in Support of their Motion to
Dismiss for Failure to State a Claim under Fed. R. Civ. P. 12(b)(6), and in support hereof show
unto the Court the following:

**BACKGROUND**

Plaintiff Brandon Meng ("Plaintiff") has sued his former medical school, its dean, and his
professor because, as he claims, their discipline of him deprived him of a career as an osteopathic
physician. His claims center on spurious claims of racial discrimination coupled with his general
grievances about Dean Subbarao's decision to issue him a non-academic warning. The warning
stemmed from Plaintiff's unprofessional conduct in his interactions with Edward Friedlander,
M.D. ("Dr. Friedlander"), one of his professors at WCU's College of Osteopathic Medicine
("COM"). For the litany of reasons discussed below, Plaintiff's allegations fail to state a claim
against Defendants for which relief can be granted.

Plaintiff alleges[1] he is a Canadian citizen of Chinese descent who was a student at WCU's COM during the 2023-24 school year. [Dkt. #1], at 2, ¶ 4. Plaintiff says he experienced nausea and flu symptoms in August 2023 and that his symptoms were "not substantially different" from those symptoms experienced by his non-Chinese classmates. *Id*. at 3, ¶ 8. Plaintiff alleges that on September 21, 2023, Dr. Friedlander accused him of having tuberculosis (TB). *Id*. at 3, ¶ 9. Dr. Friedlander, a separate defendant here, has attached the pertinent email exchanges to his motion to dismiss. [Dkt. #10-1], at 1-2. They show that Dr. Friedlander merely mentioned a hypothetical TB test when discussing his concern for Plaintiff's health. *Id*. Dr. Friedlander did not "accuse[]" Plaintiff of having (TB); instead, his email simply suggested a TB test might be appropriate given Plaintiff's statement that he had been "sick since the beginning of the semester," that he had previously had "fever and was constantly coughing," and that he still had "episodic chest pain and nausea." *Id*. Plaintiff does not allege Dr. Friedlander threatened Plaintiff's status as a student, that he required Plaintiff to submit to a TB test, or that Plaintiff refused to do so and therefore suffered negative consequences. According to Plaintiff, Dr. Friedlander's suggestion that he be tested for TB (among other things) was racist. Plaintiff says Dr. Friedlander had made no such accusations to other students with cold-like symptoms who were not of Chinese descent. *Id*. at 3, ¶ 9. In sum, Plaintiff surmises that Dr. Friedlander disliked Plaintiff for no reason other than his Chinese ancestry. *Id*. at 3, ¶ 9.

In any event, it is undisputed that Plaintiff confronted Dr. Friedlander in his office about Dr. Friedlander's suggestion he have a TB test. [Dkt. #1], at 3, ¶ 11. That interaction between the two would later give rise to the base for Plaintiff's claims here. During that confrontation, Plaintiff alleges he asked Dr. Friedlander, "Is it because of my background?" but Dr. Friedlander would not

---

[1] Defendants accept Plaintiff's factual allegations below as true only for purposes of this Motion to the extent such factual allegations are well-plead.

discuss Plaintiff's allegation with him. *Id*. at 4, ¶ 11. Dr. Friedlander allegedly told Dean Subbarao about the confrontation and Dean Subbarao "accused" Plaintiff of having threatened Dr. Friedlander during the office confrontation. *Id*. at 4, ¶ 12. Dean Subbarao then ordered Plaintiff to leave WCU's campus accompanied by a security guard. *Id*. at 4, ¶ 12. Plaintiff further alleges that Dr. Friedlander denied telling Dean Subbarao that Plaintiff threatened him. *Id*. at 4, ¶ 12.

On September 28, 2023, WCU's faculty-led Student Affairs Committee ("SAC")[2] investigated the incident and conducted a hearing. *Id*. at 4, ¶ 14. According to Plaintiff, when the SAC met, Dr. Friedlander denied that Plaintiff threatened him, and the SAC ultimately recommended to Dean Subbarao that Plaintiff not be disciplined. *Id*. at 5, ¶¶ 14-16. Plaintiff contends that after receiving the initial SAC recommendation, Dean Subbarao later obtained an amended statement from Dr. Friedlander stating that Plaintiff had threatened him. *Id*. Dean Subbarao allegedly used the amended statement from Dr. Friedlander to direct the SAC to reconvene, review the "new" information, and reconsider its earlier decision to recommend no disciplinary action be taken against Plaintiff. *Id*. at 5, ¶ 16. The SAC again declined to recommend disciplinary action against Plaintiff. *Id*. at 5, ¶ 16.

Dean Subbarao ultimately disagreed with the SAC's recommendation of no discipline and issued Plaintiff a non-academic "Warning for Unprofessional Behavior" on October 2, 2023. *Id*. at 5, ¶ 15. Dr. Friedlander's motion to dismiss includes a copy of the "warning" Plaintiff received from Dean Subbarao. It states:

> Student Doctor Meng,
>
> Based upon evidence from the night of September 21, 2023 there was an interaction that was outside the scope of WUCOM's professional expectations. As such, I am placing you on Non-Academic Warning for the duration of the academic year.

---

[2] Plaintiff contends WCU's COM's student handbook requires a factual basis and an investigation by the SAC before the COM can discipline a student. [Dkt. #1], at 4, ¶ 13.

Any violation of the Osteopathic Oath, the WUCOM Student Handbook, or the WUCOM Clinical Services Rotation guidelines will result in your referral to the Student Affairs Committee and could result in Non-academic Probation or your dismissal from WUCOM.

Per WUCOM Student Handbook and Catalog: "Students on non-academic warning are prohibited from participating in student clubs, organizations, and peer tutoring, as well as travel to convention, conferences, meetings, recruiting trips, or other travel. The Student Affairs Committee recommend other prohibitions at their discretion," and indicates letters of warning are given in lieu of a more stringent penalty but may be considered as part of the committee's recommendation in future actions. This letter will not be reported on your MSPE or your permanent record.

Please meet with Ms. Mallorie Davis for further instructions on continuing the academic year.

I expect you to be a model student, exhibiting academic excellence and professional behavior. Please feel free to contact me at any time if I can be of assistance in attaining your goal of becoming an osteopathic physician. Any further occurrences of this sort could result in more serious actions, including and up to your dismissal from the WUCOM.

Sincerely,

Italo R. Subbarao, DO, MBA
Dean, William Carey University College of Osteopathic Medicine

[Dkt. #10-2].

Plaintiff does not allege that he was not allowed to return to the COM as a student. Rather, Plaintiff alleges that these disciplinary proceedings contributed to his diagnosis of adjustment disorder with depressed mood on October 18, 2023. [Dkt. #1], at 6, ¶ 18. He contends his temporary removal from campus for the eleven-day period occurred during his "cardiology block," which he contends, without any factual support, "made it impossible for [him]to catch up on his studies." *Id*. at 6, ¶ 19. Despite clear instructions from Dean Subbarao that he should contact a WCU staff person "for further instructions on continuing the academic year" and Dean Subbarao's offer to help Plaintiff "at any time" if he needed "assistance in obtaining [his] goal of becoming

an osteopathic physician," [Dkt. #10-2], Plaintiff inexplicably never returned to WCU.[3] Plaintiff does not allege that he followed Dean Subbarao's instructions, [Dkt. #10-2], or what really prevented from returning to classes at WCU. He does claim his deteriorated mental state "contributed" to his failure to return to school. *Id*.

Turning to his allegations of racial discrimination, even a cursory review shows them to be extremely sparse. Plaintiff claims to know of one non-Chinese student who stalked and harassed another student but was "allowed to continue his schooling uninterrupted." *Id*. at 6, ¶ 21. Plaintiff also alleges that "upon information and belief, Defendant Subbarao has never removed a non-Chinese student from campus without a factual basis, and without complying with the student handbook." *Id*. at 6-7, ¶ 21. He alleges no facts supporting a claim of direct evidence of racial discrimination; he only makes the sparse reference to the one unknown comparator and his "information and belief" about whether Dean Subbarao has generally ever removed a "non-Chinese student from campus[.]" *Id*. In the end, Plaintiff alleges he was removed "without factual basis" but even that claim is belied by Plaintiff's own account of what happened, coupled with Dean Subbarao's explanation of why he decided to issue Plaintiff a non-academic warning. [Dkt. #10-2].

In any event, Plaintiff concedes he had experienced prior academic problems before this incident and that he previously had been required to repeat one year of school at the COM because of his insufficient score on the COMSAE. [Dkt. #1], at 7, ¶ 22. He contends this repeat year, in addition to "the actions of Defendants," would have prevented him from finishing the four-year COM curriculum within a six-year time limit for completion of his medical schooling. *Id*. at 7, ¶

---

[3] Plaintiff's Complaint refers to alleged "inconsistent" emails from Dean Subbarao's subordinate regarding his status on campus, but he does not say when they were sent, who sent them, or what they said. He claims they left him "uncertain as to how to…attempt to return to school." [Dkt. #1], at 6, ¶ 20.

23. Thus, Plaintiff alleges that because of this claimed domino effect, his "potential career as a physician has been ruined." *Id*. at 7, ¶ 23.

On December 23, 2024, Plaintiff sued Defendants and Dr. Friedlander.[4] [Dkt. #1]. Plaintiff asserts the following claims: (1) violation of Title VI against WCU; (2) breach of the COM's student handbook against WCU; (3) breach of implied obligation of good faith against WCU; (4) malicious interference with contract against Dean Subbarao; (5) malicious interference with contract by Dr. Friedlander;[5] (6) discrimination based upon ethnicity under 42 U.S.C. § 1981 against all defendants; (7) breach of contract against WCU; and (8) violations of Commission on Osteopathic College Accreditation ("COCA") standards (presumably against all defendants).

## ARGUMENT

### Governing Law

When presented with a motion to dismiss under Rule 12(b)(6), district courts consider "whether the complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 257 (5th Cir. 2014), citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In resolving a Rule 12(b)(6) motion, courts must accept all well-pleaded facts as true and view those facts in the light most favorable to a plaintiff. *Public Employees Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014) (citation omitted). But courts do not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010). Moreover, "a formulaic recitation of the elements of a cause of action will not do…" *Jebaco, Inc. v. Harrah's*

---

[4] Defendant Friedlander is represented by separate counsel.

[5] Because Plaintiff asserts this claim only against Dr. Friedlander, who takes no part in this Motion to Dismiss, this Motion does not discuss this claim further.

*Operating Co.*, 587 F.3d 314, 318 (5th Cir. 2009), citing *Twombly*, 550 U.S. at 555. Legal conclusions must be supported by factual allegations. *See Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010).

"[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). To be sure, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."[6] *Causey v. Sewell Cadillac–Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). When conclusory allegations and unwarranted deductions of fact are contradicted by facts disclosed in exhibits attached to the pleadings, the allegations are not accepted as true. *See Carter v. Target Corp.*, 541 F. App'x 413, 417 (5th Cir. 2013). This Court will need to utilize all these principles in analyzing Plaintiff's Complaint.

**1.    The Court should dismiss Plaintiff's Title VI claim against WCU because Plaintiff fails to allege intentional discrimination attributable to WCU.**

In Count 1, Plaintiff claims WCU discriminated against him in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d. [Dkt. #1], at 6-7, ¶ 25. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

---

[6] Defendants attach one exhibit to their Motion, which is the WCU COM student handbook, referred to throughout Plaintiff's Complaint. *See* Ex. A. This Motion also relies on communications referenced in Plaintiff's Complaint and attached to Dr. Friedlander's motion to dismiss. [Dkt. #10]. This Court may consider those exhibits at the Rule 12(b)(6) stage. *Causey*, 394 F.3d 2 at 288.

Plaintiff alleges the racial discrimination he experienced derives from Dean Subbarao's decision to temporarily remove him from campus pending the SAC proceedings.[7] *Id*. He pleads no factual allegations of direct evidence of discrimination but references WCU's treatment of an unknown comparator student and his general "belief" that "Dean Subbarao has never removed a non-Chinese student from campus without a factual basis, and without complying with the student handbook." *Id*.

### A.    Plaintiff Fails to Allege the Existence of an Institutional Policy that is Discriminatory or Deliberate Indifference Amounting to Such a Policy.

Because individuals cannot be liable under Title VI,[8] courts focus their review of intentional discrimination on acts that can be attributed to the *institution* rather than the *individual*, which generally means a plaintiff must prove the existence of an institutional policy that is discriminatory. *See, e.g., Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582 (1983) (reviewing whether layoffs made under a "last-hired, first-fired" policy were discriminatory under Title VI). But "[w]hen a case does not involve the [institution's] 'official policy,' Title VI…require[s] deliberate indifference." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 (5th Cir. 2020), quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). To state a Title VI deliberate indifference claim, Plaintiff "must plausibly allege that an 'appropriate person' in the [institution]—i.e., someone who could take corrective measures—had 'actual knowledge' of intentional discrimination yet responded with 'deliberate indifference.'" *Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 237 (5th Cir. 2020), quoting *Gebser*, 524

---

[7] A careful reading of Plaintiff's Complaint reveals that Plaintiff does not allege facts showing that his ultimate "constructive expulsion" from WCU was the result of racially discriminatory action by WCU or Dean Subbarao.

[8] *See Price ex rel. Price v. Louisiana Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009), citing *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1044 n. 9 (5th Cir. 1984).

U.S. at 290. Importantly, an entity is only responsible for "its own official decision," not "its employees' independent actions." *Gebser*, 524 U.S. at 291.

Even assuming Dr. Friedlander discriminated against Plaintiff, Plaintiff's Complaint fails to allege that an "appropriate person" knew of Dr. Friedlander's alleged discrimination against Plaintiff but acted with "deliberate indifference." *Id.* Although Plaintiff asserts in conclusory fashion that Dr. Friedlander discriminated against him, he has not alleged that anyone in WCU's administration had actual knowledge of the supposed discrimination. And the emails provided by Dr. Friedlander in support of his motion to dismiss do not evidence any racial discrimination of Plaintiff. [Dkt. #10-1], at 1-2. The most charitable reading of Plaintiff's Complaint and the emails show only that Dean Subbarao accepted Dr. Friedlander's belief that Plaintiff had unprofessionally and inappropriately confronted Dr. Friedlander about Dr. Friedlander's statement about Plaintiff's health—not that Dean Subbarao was aware of any discriminatory purpose underlying Dr. Friedlander's reports to Dean Subbarao. Because Plaintiff fails to allege intentional discrimination attributable to WCU via an "appropriate person" having "actual knowledge" of discrimination, Plaintiff has failed to state a Title VI violation.

### B. Plaintiff Fails to Plausibly Plead "Constructive Expulsion" from WCU if Such a Claim is Even Recognized under Title VI.

Plaintiff's Title VI claim is predicated on what appears to be a claim of "constructive discharge" or "constructive expulsion" from WCU's COM. Plaintiff does not allege that WCU directly expelled him from school. [Dkt. #1], at 7, ¶¶ 22-23. Instead, Dean Subbarao merely issued him a non-academic warning. *Id*. at 5, ¶ 15; [Dkt. #10-2]. To the extent Plaintiff complains of a Title VI violation based on a theory that he was "constructively expelled" from WCU, one federal district court has called such a theory as "fairly novel." *Williams v. Pennridge Sch. Dist.*, 2016 WL 6432906, at *11 (E.D. Pa. Oct. 31, 2016) (holding that even assuming "such a theory is viable in

the hostile educational environment context" the plaintiff had not alleged sufficient facts to support a "constructive expulsion"). *See Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 381 (W.D. Pa. 2008) ("So far as the Court can determine, such a claim would constitute a matter of first impression within the federal system."). In any event, Plaintiff's Title VI claim appears to be based on Dean Subbarao's decision to temporarily remove him from campus, which he claims ultimately led to his "constructive expulsion" from WCU. But at least in the Title VII context, a "constructive discharge" claim requires more than just a bare allegation of discrimination. *See Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) ("Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge . . ."). In Title VII cases, courts require something more than an "employee's subjective belief that termination [was/is] inevitable." *Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 339 (5th Cir. 2014).

Plaintiff alleges he felt that he was expelled, but this test is conducted under an objective, reasonableness standard. *See Raymond v. Univ. of Houston*, 2009 WL 4604648, at *15 (S.D. Tex. Dec. 3, 2009) (holding that fact student failed exams based on alleged discrimination action failed to state a claim of constructive discharge because university gave him opportunity to retake the sections, which plaintiff rejected). No reasonable reader could read Plaintiff's factual allegations about why he left WCU and reasonably believe he was "constructively expelled." Allegations that a plaintiff received "unfair and unwarranted treatment" are not enough to establish a claim of constructive discharge. *Clowes v. Alleghany Valley Hosp.*, 991 F.2d 1159, 1162 (3d Cir. 1993).

As much as Plaintiff claims WCU created a hostile educational environment claim under Title VI leading to his "constructive expulsion," Plaintiff had to plead plausible facts showing racial harassment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the [victim's] educational experience, that the [victim is] effectively denied equal

access to an institution's resources and opportunities." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). *See Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 520 (3d Cir. 2011) (considering a Title VI hostile environment claim). Plaintiff's facts here fall well short of that standard. *See Wysocki v. Wardlaw-Hartridge School*, 2023 WL 2728807, at *7 (D.N.J. Mar. 31, 2023) (holding that plaintiff failed to adequately plead a hostile educational environment claim because none of the alleged instances were severe and none alleged raise a reasonable inference of racial discrimination). Plaintiff's facts plead regarding Dr. Friedlander's alleged racist treatment of him are not plausible. *See* [Dkt. #11]. Neither are Plaintiff's facts plead regarding any alleged racist treatment of him by Dean Subbarao. They are similarly too weak to pass muster under *Twombly* and *Iqbal*. *See Bollinger Shipyards, Inc.*, 775 F.3d at 257.

For the reasons discussed above, Plaintiff's Title VI claim fails and should be dismissed.

**2.    The Court should dismiss Plaintiff's breach of contract claim based on WCU violating the COM student handbook claim because: (1) the handbook did not create any express contract rights; and, even if it had, (2) Plaintiff failed to allege plausible violations of the handbook.**

In Count 2, Plaintiff claims WCU violated an express contract with Plaintiff in the form of the COM student handbook. [Dkt. #1], at 8, ¶ 25. According to Plaintiff, WCU disciplined him without cause and departed from the SAC investigation and recommendation policy as described in the student handbook. *Id.* at 8, ¶ 25. Plaintiff further claims that national origin-based discrimination is forbidden by the student handbook. *Id.* at 8, ¶ 25. One must presume that Plaintiff really contends his temporary removal from WCU's campus violated the student handbook because Plaintiff does not allege that the SAC did not operate under the SAC investigation and recommendation policy laid out in the student handbook.

**A.  Plaintiff's Breach of an Implied Contract Fails.**

Plaintiff's breach of contract theory against WCU here is not an unfamiliar one. "In challenging the internal decision-making process of academic institutions, students frequently predicate their claims on constitutional due process and contractual theory." *Beauchene v. Miss. Coll.*, 986 F. Supp. 2d 755, 767 (S.D. Miss. 2013) (citing cases). Mississippi law recognizes a sort of implied contract between a student and a university. *Id*. at 769. But any implied contract right a university owes a student is not viewed strictly. *See Univ. of Miss. Med. Ctr. v. Hughes*, 765 So. 2d 528, 535 (Miss. 2000) (recognizing in the context of a public university "that while the student-university relationship is contractual in nature, implicit in the university's general 'contract' with its students is a right to change the university's academic requirements if such changes are not arbitrary and capricious" and noting its "great reluctance . . . to intervene in the academic context").

The Mississippi Court of Appeals has held, in a case against WCU, that this implied contract between a university and its student only requires application of an "arbitrary and capricious" standard to actions taken by a university against a student. *See Mahaffey v. William Carey Univ.*, 180 So. 3d 846, 852 (Miss. Ct. App. 2015). It noted that "'[c]ourts have exercised reluctance in interfering with the disciplinary procedures and decisions of educational institutions, even where constitutional due process rights are guaranteed.'" *Id*. at 852, quoting *Beauchene*, 986 F. Supp. 2d at 768. "[C]ourts [give] considerable discretion to private schools' decisions.'" *Id*., quoting *Beauchene*, 986 F. Supp. 2d at 768. So, to satisfy Plaintiff's due process rights, WCU only needed to provide "'oral or written notice of the charge and evidence against [Plaintiff] and the opportunity to present his side of the story." *Id*. And to not breach its implied contract with Plaintiff, WCU only needed to avoid acting arbitrarily and capriciously. *Id*. Importantly, Plaintiff does *not* allege that WCU never informed him of what his charge was or that he was not given his opportunity to present his side of the story. Moreover, the very facts plead by Plaintiff prove WCU

did not act arbitrarily or capriciously. Plaintiff's breach of contract claim based on an implied contract right necessarily fails and should be dismissed.

### B. Plaintiff's Claim of Breach of an Express Contract Fails.

The COM student handbook did not create any express contract rights. Although the "student-university relationship is contractual in nature," Mississippi courts reject applying a "strict view of contract law" to the relationship. *Hughes*, 765 So. 2d at 534-35. Although handbook policies in some instances may give rise to contractual obligations, Mississippi courts are clear that handbook disclaimers preclude handbooks in most contexts from being subsumed into a contract between the parties. *See, e.g., Leal v. USM*, 296 So. 3d 660 (Miss. 2020); *Lee v. Golden Triangle Plan. & Dev. Dist., Inc.*, 797 So. 2d 845, 848 (Miss. 2001); *Byrd v. Imperial Palace of Miss.*, 807 So. 2d 433 (Miss. 2001); *Hartle v. Packard Elec.*, 626 So. 2d 106, 109 (Miss. 1993).

There is no reason this law should not apply in the student handbook context. Here, WCU's COM's student handbook expressly stated that it was not a contract: "**Information contained herein shall not constitute a legally binding contract upon William Carey University College of Osteopathic Medicine (WCUCOM)**…Policies, requirements, and information in this WCUCOM Student Handbook and Catalog may be updated from time to time by the WCUCOM at its sole discretion." *See* Student Handbook, attached as Exhibit A, at 2 (emphasis added).[9] Thus, Plaintiff cannot state a claim for breach of contract based on a policy from the COM student handbook.

Even if it could create express contract rights for Plaintiff, he has failed to plausibly allege that WCU violated the handbook. First, although Plaintiff points to a policy related to student discipline in complaining about his temporary removal from campus pending a hearing before the

---

[9] Because the COM student handbook is central to Plaintiff's claims and referenced in his Complaint, the attachment is properly before this Court on this Motion to Dismiss. *Causey*, 394 F.3d at 288.

SAC, he neglects to mention multiple other portions of the COM student handbook that prove the SAC's investigation and recommendation process does not operate in a silo. Indeed, the handbook makes clear that removal from campus (temporarily or permanent), or other remedial action at the COM is permissible aside from the SAC process. The COM student handbook specifically states that WCU:

> [R]eserves the right to dismiss any student at any time that poses a threat to the safety of any student(s), staff, faculty, or visitor(s). This includes but is not limited to, written threats, social media threats, text message threats, verbal threats, physical threats and weapons on campus.

Ex. A, at 40 (emphasis removed). Another potion of the COM student handbook states:

> William Carey University reserves the right to require the immediate withdrawal of any student whose conduct poses a direct threat to the health and safety of the student or others, as determined by WCU. **In cases where safety or orderly function of the COM is potentially jeopardized, the WCUCOM Dean or the Office of the WCU President may require the student be physically removed from the WCU campus until the appeal is resolved. Should an incidence necessitate, such removal will be immediate.** Check-Out Procedures for Student Dismissal or Withdrawal will be modified to accommodate orderly function and safety for all parties and may be waived.

*Id*. at 173 (emphasis added). And another provision states: "WCUCOM reserves the right to dismiss any student at any time prior to graduation. Circumstances warranting such action may be of an academic, legal, or social nature among others." *Id*. at 157. The COM student handbook makes clear that the processes of advisory committees, like the SAC here, will never take precedence over the welfare of WCU's students, the institution, or the public:

> In all cases, the welfare of students, the institution, and the general public served by our graduates is paramount to the deliberations and recommendations set forth by the advisory committees. WCUCOM reserves the right to require the withdrawal of any student at any time it is deemed necessary to safeguard the WCUCOM ideals of scholarship and character or to secure compliance with its regulations.

*Id*. at 151-52.

Simply put, based on the clear text of the COM student handbook, Dean Subbarao was authorized to take immediate, preliminary action to have Plaintiff temporarily removed from campus rather than waiting for a deliberative advisory committee investigation to begin and conclude. It makes sense that any number of emergency scenarios could require immediate action pending formal (and permanent) student discipline. This example shows that the student discipline policies guided rather than mandatorily governed the subject incident and that there was no breach of any express provision of the COM student handbook. But that said, even minor deviations from the COM student handbook could not state a claim for breach of contract based on those. *See Mahaffey*, 180 So. 3d at 853 (holding that minor deviations from the student handbook were inconsequential and failed to show arbitrary and capricious conduct by WCU); *Beauchene*, 986 F. Supp. 2d at 771 (school's other acts "more than compensate[d] for their minor deviations from the Student Honor Code's written procedures.").

Finally, although Plaintiff alleges the COM student handbook "prohibits discrimination based on national origin," *Id*. at 8, § 25, the arguments for dismissal of the Title VI and Section 1981 claims here show that Plaintiff has failed to plausibly allege racial discrimination by either WCU or Dean Subbarao. Thus, Plaintiff has failed to allege a breach of the COM student handbook on that basis. Consequently, the Court should dismiss Count 2 in whole.

**3.    The Court should dismiss Plaintiff's breach of good faith claim against WCU because Plaintiff has failed to allege actions attributable to WCU that amount to bad faith or a due process violation.**

In Count 3, Plaintiff claims WCU breached the implied obligation of good faith by falsely accusing Plaintiff of having TB and expelling him from campus without due process. [Dkt. #1], at 8, ¶ 25. "Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith

characterized by some conduct which violates standards of decency, fairness or reasonableness." *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss.1992), quoting Restatement (Second) of Contracts § 205, 100 (1979). "Bad faith, in turn, requires a showing of more than bad judgment or negligence; rather, 'bad faith' implies some conscious wrongdoing 'because of dishonest purpose or moral obliquity." *Univ. of S. Mississippi v. Williams*, 891 So. 2d 160, 170-71 (Miss. 2004) (cleaned up); *Caplinger v. Whitney Bank*, 293 So. 3d 307 (Miss. Ct. App. 2020) ("[A] party does not breach the implied covenant of good faith and fair dealing when the party took only those actions which were duly authorized by the contract.") (citations omitted).

In undertaking an *Eerie* analysis, there is no reason to believe a Mississippi court would not follow the analysis laid out in *Mahaffey v. William Carey Univ.*, 180 So. 3d 846, 852 (Miss. Ct. App. 2015) and adopted in *Beauchene v. Mississippi Coll.*, 986 F. Supp. 2d 755, 767 (S.D. Miss. 2013) when assessing the validity of Plaintiff's claim of "breach of good faith" here. Plaintiff has failed to allege an act by WCU that amounts to bad faith under these precedents. First, Plaintiff alleges that Dr. Friedlander accused Plaintiff of having TB, but good faith exists only "between [the] two parties" to this contract, and Dr. Friedlander was merely an instructor rather than a party to an alleged student university contract. *Cenac*, 609 So. 2d at 1272. Thus, Plaintiff cannot state a breach of good faith claim based on Dr. Friedlander's actions.

Second, WCU is a private, not public, university and because of that "students' continued enrollment" is not "deemed a protected property" with constitutional protections like in the public university context. *Beauchene*, 986 F. Supp. 2d at 767. Plaintiff fails to allege a due process violation that would qualify as a breach of good faith. "Courts have exercised reluctance in interfering with the disciplinary procedures and decisions of educational institutions, even where constitutional due process rights are guaranteed." *Id*. at 768. Because WCU is a private institution,

"causes of actions against [it] are usually limited to only breach of contract claims" rather than claims based on the protections afforded under the Fourteenth Amendment for students of public universities. *Id.* As such, "courts have given considerable discretion to private schools' decisions." *Id.* But even in the public college setting, students are entitled only to an "informal give-and-take" prior to final disciplinary dismissals. *Id.* at 769. In this setting, a disciplinary action is reviewed only to determine whether the action was arbitrary or capricious. *Id.* Plaintiff concedes that WCU undertook a formal committee process through the SAC before Dean Subbarao made a final decision on the discipline imposed on Plaintiff. *Id*. at 5, ¶ 16. Considering the significant deference afforded to private academic institutions' disciplinary decisions, Plaintiff fails to state a claim for "breach of good faith." Consequently, the Court should dismiss Count 3.[10]

### 4.    The Court should dismiss Plaintiff's malicious interference claim against Dean Subbarao because Plaintiff has failed to allege bad faith.

In Count 4, Plaintiff claims that Dean Subbarao maliciously interfered with Plaintiff's student contract with WCU by temporarily removing him from campus and by attempting to persuade the SAC to adopt his conclusions regarding the allegation that Plaintiff threatened Dr. Friedlander. [Dkt. #1], at 8-9, ¶ 25. "Tortious interference with contract is the 'malicious or intentional interference with a valid and enforceable contract by a third party which causes one contracting party not to be able to perform and the failure to perform results in a monetary loss for the other contracting party.'" *Cromwell v. Williams*, 333 So. 3d 877, 882 (Miss. Ct. App. 2022) (citation omitted). To begin with, this claim fails for the same reasons Plaintiff's breach of contract claims fail. There was only an implied contract between WCU and Plaintiff and Plaintiff fails to

---

[10] Furthermore, because the WCU COM student handbook did not create contractual rights, no bad faith claim can arise from alleged breaches of the policies in that handbook. *See S. Farm Bureau Life Ins. Co. v. Thomas*, 299 So. 3d 752, 757 (Miss. 2020) (dismissing a breach of good faith claim premised on handbook provisions because the handbook contained a contractual disclaimer).

plausibly plead a breach of it by anyone. Plaintiff's allegations do not plausibly show a failure to perform, a required element of this claim. *Id*. at 882.

This claim fails for an additional reason. Dean Subbarao is not a third party; he is an agent of Plaintiff's former school, WCU. Thus, Dean Subbarao is generally privileged against interference claims from former WCU students. Mississippi courts abrogate that doctrine only in the presence of bad faith: "[O]ne occupying a position of responsibility on behalf of another is privileged, within the scope of that responsibility and absent bad faith, to interfere with his principal's contractual relationship with a third person." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). Bad faith as it relates to tortious interference claims means "without right or good cause." *Cromwell*, 333 So. 3d at 885 (cleaned up). When an agent takes actions "within the course and scope of [his or her] employment," such actions cannot be "evidence of malice," and, therefore, do not indicate bad faith. *Id.* at 888.

Here, Plaintiff alleges Dean Subbarao issued him a non-academic warning. [Dkt. #1], at 8-9, ¶ 25. But student discipline is squarely within a dean's wheelhouse. At base, Plaintiff alleges Dean Subbarao was informed that a student unprofessionally confronted a COM professor. Based on Plaintiff's Complaint, Dean Subbarao was privileged to conclude the situation merited temporary action to protect students and faculty. Moreover, the COM student handbook made clear that Dean Subbarao (and WCU generally) had the authority to take such action. Based on Plaintiff's allegations, Dean Subbarao acted within his scope of employment to discipline Plaintiff. Thus, Plaintiff has failed to allege bad faith, and Dean Subbarao is immune from a malicious interference claim. Consequently, the Court should dismiss Count 4 for the reasons above.

5.    **The Court should dismiss Plaintiff's Section 1981 claim against Defendants.**

In Count 6, Plaintiff claims Defendants discriminated against him based on his Chinese ethnicity, violating 42 U.S.C. § 1981. [Dkt. #1], at 9, ¶ 25. Plaintiff alleges the contract-related discrimination he experienced derived from Dean Subbarao's decision to temporarily remove him from campus pending the SAC proceedings. *Id*. at 6-7, ¶ 25. Plaintiff makes no allegation that his ultimate "constructive discharge" from WCU was because of racially discriminatory action by WCU or Dean Subbarao.

Section 1981 guarantees to all persons within the jurisdiction of the United States the "same right … to make and enforce contracts … as is enjoyed by white citizens …." Section 1981 "bars race discrimination in contracting." *Perry v. VHS San Antonio Partners, LLC*, 990 F.3d 918, 931 (5th Cir. 2021) (emphasis omitted). But this ban on race discrimination in contracting does not amount to "a general cause of action for race discrimination." *Id*. (citation omitted).To state a Section 1981 claim, a plaintiff must allege that "(1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in [§ 1981], such as the making and enforcing of a contract." *Id.* A plaintiff "must initially identify an impaired 'contractual relationship,'…under which [he] has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (citation omitted). Accordingly, a plaintiff fails to state a claim when he does not "identify the content of the contract at issue" or "the particular contractual rights that the [defendants] prevented [him] from exercising." *Grambling Univ. Nat'l Alumni Ass'n v. Bd. of Sup'rs for La. Sys.*, 286 F. App'x 864, 870 (5th Cir. 2008). Importantly, Plaintiff must also plead that his race was the "but-for cause" of the loss of the legally protected contract right. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

### A.  Plaintiff Fails to Plausibly Plead a Breach of a Cognizable Contract Right.

As discussed above, Plaintiff has failed to identify a contract right that has been violated based on his temporary removal from WCU's campus. Admission to a private academic institution carries no such right to complete enrollment so long as the private university does not act arbitrarily or capriciously. *See Beauchene*, 986 F. Supp. 2d at, 767. Plaintiff might have been entitled to an "informal give-and-take" prior to a final disciplinary action, but Plaintiff does not allege that he did not receive that. *Id.* at 769. He also cannot point to the creation of an express contract right in the COM student handbook. *See, e.g., Leal*, 296 So. 3d 660; *Lee*, 797 So. 2d at 848; *Byrd*, 807 So. 2d 433; *Hartle*, 626 So. 2d at 109. In the absence of such a right—contractual or otherwise— Plaintiff cannot plead allegations that would support a Section 1981 claim. *See Domino's Pizza, Inc.*, 546 U.S. at 476.

### B.  Plaintiff Fails to Plausibly Plead Intentional Discrimination Based on His Race.

Although Count 6 focuses on Plaintiff's supposed right to "complete his enrollment," he pleads no facts to support that his ultimate "constructive expulsion" was based on race. *See* [Dkt. #1], at 6-7, ¶ 25. The Fifth Circuit has held that "'naked allegation[s]' of discriminatory intent are too conclusory to survive a motion to dismiss" a Section 1981 claim. *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017) (citation omitted). Here, Plaintiff simply alleges that he was treated differently "because of his Chinese ancestry" on two bases: One, because he "knows of a classmate, who is not of Chinese ancestry[,] who had threatened and stalked another student" but allowed "to continue his schooling uninterrupted." [Dkt. #1], at 6-7, ¶ 21. And two, "upon information and belief, Defendant Subbarao ha[d] never removed a non-Chinese student from campus without a factual basis, and without complying with the student handbook." *Id.* at 6-7, ¶ 21.

While an "allegation that similarly situated non-minorities received better treatment" may give rise to an inference of discrimination, "generalized allegations" that do not identify "specific instances" of disparate treatment do not satisfy this standard. *Body by Cook*, 869 F.3d at 386. Here, Plaintiff must allege the purported comparators were granted more favorable treatment under "nearly identical circumstances" such that any dissimilarities do not account for the difference in treatment. *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001).[11] Here, Plaintiff pleads no facts delineating the alleged discriminatory action was taken "under nearly identical circumstances." *Lee*, 574 F.3d at 260. Plaintiff pleads no facts placing him and the other, unnamed, student on equal footing or, for that matter, even that the same decisionmaker was involved. *Id*. Here it is unclear how Plaintiff can plausibly plead this other student as a comparator "when [he] fails to name or otherwise identify [the] comparator . . . , much less explain why [he is] similarly situated." *Owens v. Circassia Pharmas., Inc.*, 33 F.4th 814, 827 (5th Cir. 2022).

## C. Plaintiff Fails to Plausibly Plead a Section 1981 Claim Against Dean Subbarao Individually.

As for Plaintiff's Section 1981 claim against Dean Subbarao, it fails as a matter of law. Plaintiff cannot plausibly state a Section 1981 claim against Dr. Subbarao under the theory that he interfered with his contract with WCU. The Fifth Circuit does not recognize a "a true third-party-interference theory of § 1981 liability." *Perry*, 990 F.3d at 933. Rather, the statute only allows for third-party liability where the third party and the contracting entity are "essentially one and the same." *Id*., *citing Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997). This exception applies only where the Section 1981 defendant is "only nominally a third party." *Id*. Here, it is

---

[11] While *Lee* and *Wallace* involved Title VII, "[t]he analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims." *Body by Cook*, 869 F.3d at 386 (*citing Jones v. Robinson Prop. Grp. L.P.*, 427 F.3d 987, 992 (5th Cir. 2005)).

undisputed that Dean Subbarao, as Dean of WCU's COM, was an agent for a disclosed principal (WCU) and because he was not the alleged contracting party with Plaintiff, he cannot be liable for violating Section 1981. *Id*. For all the reasons discussed above, the Court must dismiss Count 6 against both Defendants.

**6.    The Court should dismiss Plaintiff's breach of contract claim against WCU because: (1) no express or implied term created a right to graduate; and (2) WCU's disciplinary action did not prevent Plaintiff from graduating.**

In Count 7, Plaintiff claims WCU breached its express and implied contract to permit Plaintiff to complete medical school. [Dkt. #1], at 9, ¶ 25. To begin with, there cannot be an express contract and an implied contract that relates to the same subject matter. *See Virden v. Campbell DeLong, LLP*, 371 So. 3d 1256, 1262 (Miss. 2023), citing 17 C.J.S. Contracts § 16. As much as Plaintiff claims damages for breach of an express contract based on the student handbook, this claim should be dismissed for the same reasons discussed above regarding the handbook contract disclaimer and the fact that Mississippi law does not recognize express contract rights in the student-university context. *Hughes*, 765 So. 2d at 535; *Beauchane*, 986 F. Supp. 2d  at 767-68. Moreover, Plaintiff has failed to point to a specific, express contract term that permitted Plaintiff to finish medical school.

Although there is generally an implied contract between a university and its students, *Hughes*, 765 So. 2d at 535, no Mississippi court has held that a student's initial admission creates an unqualified right to graduate. Moreover, a "university is entitled to modify" the terms of the implied contract "so as to properly exercise its educational responsibility." *Id.* at 534 (citation omitted). The Mississippi Supreme Court's holding in *Hughes* regarding graduation requirements illustrates that there is no right to graduate set in stone at the time of admission. *Id*. In the absence of an implied contract guaranteeing Plaintiff's graduation, this claim fails.

In addition to these legal shortcomings, Plaintiff failed to plead facts to support his claim that WCU prevented him from graduating. Plaintiff surmises that the eleven-day period between Dean Subbarao allegedly removed him from campus and the disciplinary matter concluding[12] "interrupt[ed] his course of study" and made it "impossible for Plaintiff to continue medical school" and graduate within the six-year deadline. [Dkt. #1], at 5-6, ¶¶ 15, 17. But this alleged interruption only occurred for an eleven-day period, September 21 through October 2, 2023, and Plaintiff pleads no specific facts delineating why he was unable to continue school. *Id*. at 3, 5, ¶¶ 9, 15. This is especially true considering Dean Subbarao's instruction to Plaintiff to reach out to a WCU staff person about resuming his studies and Dean Subbarao's unconditional offer to help him complete his education. [Dkt. #10-2]. In sum, Plaintiff's Complaint states only that he was investigated for eleven days and that the result was a non-academic warning, which Dean Subbarao coherently explained should have no effect on his schooling. *Id*. By Plaintiff's own alleged facts, his failure to graduate was his own choice and not WCU's decision. Consequently, the Court must dismiss Count 7.

**7.    The Court should dismiss Plaintiff's COCA violation claim against Defendants because the COCA standards do not create a private right of action.**

In Count 8, Plaintiff claims Defendants violated a COCA standard by failing to adhere to policies that "require non-discrimination with respect to ethnicity, require distribution of such policy, and require a mechanism to report alleged discrimination incidents and track their resolution." [Dkt. #1], at 9, ¶ 25. But professional school accreditation standards do not create private rights of action, and so they are unenforceable in court. The reason for this was explained

---

[12] Concluding with Dean Subbarao placing a "Warning for Unprofessional Behavior" in Plaintiff's student file. *See* [Dkt. #10-2].

by one district court in *Shinabargar v. Bd. of Trustees of Univ. of D.C.*, 164 F. Supp. 3d 1, 30–31

(D.D.C. 2016):

> The crux of these three claims is the plaintiff's effort to seek redress for a perceived failure by UDC Law School to comply with an ABA Standard. Other courts confronted with similar claims have consistently found that ABA standards do not create a private right of action. *See Waller v. Southern Illinois Univ.*, 125 F.3d 541, 542 (7th Cir. 1997) ("Even if a public institution, in order to be accredited by the ABA, promises to adhere to the standards for accreditation that the ABA has laid down, it would not follow that the institution was undertaking a contractual duty to its students .... But of course the institution could if it wanted (and it was permitted by state law) enter into a contract with the students to abide by the ABA's standards[.]"); *Hewett v. City of Grand Rapids*, No. 1:12–cv–998, 2012 WL 5409790, at *8 (W.D. Mich. Oct. 15, 2012) ("The ABA Standards describe the requirements that a law school must meet to obtain and retain ABA approval. Neither the ABA nor the Higher Education Act ... creates a private right of action enforceable in federal court." (citing *Thomas M. Cooley Law School v. Am. Bar Ass'n*, 459 F.3d 705, 711 (6th Cir. 2006) & *Waller v. S. Illinois Univ.*, 125 F.3d 541 (7th Cir. 1997)). The reasoning of these courts is persuasive.

*Id. See also Smith v. Roger Williams Univ. L. Sch.*, 2022 WL 2387632, at *3 (D.R.I. Feb. 16, 2022)

("Courts have found that ABA standards do not provide a private right of action…Claim 1(g)

should therefore be dismissed."). Because no cause of action supports enforcing the private COCA

accreditation standards against Defendants, Plaintiff has failed to state a claim.

Even if there were a private cause of action for enforcement of the COCA standards, the

Standard Plaintiff relies on in Count 8 requires *only* that "[a] proposed COM must have a policy

of non-discrimination…"  [Dkt. #1-3], at 2. Because Plaintiff does not allege that WCU lacked

such a policy, WCU could not have breached that Standard. For these reasons, Plaintiff has failed

to state a claim, and the Court should dismiss Count 8.

## CONCLUSION

In sum, the Court should dismiss these claims alleged against Defendants Italo R. Subbarao

and William Carey University because the allegations as pleaded by Plaintiff fail to sufficiently

state claims for which relief can be granted under Fed. R. Civ. P. 12(b)(6). Accordingly,

Defendants respectfully request that this Court dismiss these claims against them.

This, the 12th day of March, 2025.

Respectfully submitted,

**ITALO R. SUBBARAO, D.O. and WILLIAM CAREY UNIVERSITY, DEFENDANTS**

By:    /s/ *Charles E. Cowan*
CHARLES E. COWAN (MSB #104478)

**OF COUNSEL**:
Jennifer H. Scott (MB #101553)
Charles E. Cowan (MB #104478)
Jack F. Hall (MB #106482)
WISE CARTER CHILD & CARAWAY, PA
401 E. Capitol Street, Suite 600
Post Office Box 651
Jackson, Mississippi 39205
Telephone: (601) 968-5514
Facsimile: (601) 968-5519
jhs@wisecarter.com
cec@wisecarter.com
jfh@wisecarter.com

**CERTIFICATE OF SERVICE**

I, Charles E. Cowan, hereby certify that I have electronically filed the foregoing with the Clerk of Court using the ECF system, which automatically sent email notification to all counsel of record.

SO CERTIFIED:  March 12, 2025

/s/ *Charles E. Cowan*
CHARLES E. COWAN